IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROGER BLAKENEY, NC DOC # 0033802,           )
NATHAN BOWIE, NC DOC # 0039561, RICHARD     )
CAGLE, NC DOC # 0061528, ERIC CALL, NC DOC  )
# 0542384, WADE COLE, NC DOC # 0082151, DANIEL )
CUMMINGS, NC DOC # 0095279, JOHNNY          )
DAUGHTRY, NC DOC # 0099090, PHILLIP DAVIS, NC )
DOC # 0585797, DANNY FROGGE, NC DOC # 0137368,)
TILMON GOLPHIN, NC DOC # 0590940, WARREN    )
GREGORY, NC DOC # 0156518, JERRY DALE       )
HILL, NC DOC # 0511057, JOHNNY HYDE, NC DOC  )
# 0542024, THOMAS LARRY, NC DOC # 0233526,   )
JIMMIE LAWRENCE, NC DOC # 0597164, DAVID     )
LYNCH, NC DOC # 0251740, JOHN MCNEIL, NC DOC )
# 0275678, JEFFERY MEYER, NC DOC # 0280127,  )
CARL MOSELEY, NC DOC # 0294214, ERROL MOSES,)
NC DOC # 0552017, NASIR AL-DIN SADDIQ, a/k/a )
LAWRENCE PETERSON, NC DOC # 0320825, and    )
DARRELL STRICKLAND, NC DOC # 0393145,       )
                                            )
                 Plaintiffs                 )
                                            )
         v.                                 )          **COMPLAINT**
                                            )
THEODIS BECK, Secretary for the             )
North Carolina Department of Correction,    )
GERALD BRANKER, Warden of Central Prison    )
in Raleigh, North Carolina, and             )
UNKNOWN EXECUTIONERS,                       )
Individually, and in their Official Capacities, )
                                            )
                 Defendants.                )

Plaintiffs, complaining of Defendants, allege the following.

## I.     Nature of the Action

1.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to expeditiously preserve

their right to be free from a method of execution by lethal injection that, if used, will inflict cruel

and unusual punishment as proscribed by the Eighth and Fourteenth Amendments to the United

States Constitution and deprive Plaintiffs of their rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution and freedom of speech under the First and Fourteenth Amendments to the United States Constitution.

2. The questions raised in this Complaint about the substance of North Carolina's method of execution, as well as questions about the manner in which that method has been authorized by North Carolina law, are at issue in ongoing state lawsuits. In particular, on November 1, 2007, North Carolina's Governor and Council of State issued a decision approving changes to the method of execution. (Exhibit A). However, that decision will be appealed and subjected to *de novo* review by the Superior Court of Wake County, North Carolina pursuant to N.C. Gen. Stat. § 150B-51(b) and (c). Moreover, the question of doctor participation in executions is currently being litigated in an appeal of the Superior Court of Wake County's *Order Granting Plaintiff's Request for Declaratory Relief and Denying Defendant's Motion to Dismiss* in *North Carolina Department of Correction v. North Carolina Medical Board*, No. 07-CVS-3574 (N.C. Sup. Ct. Sept. 21, 2007). (Exhibit B). As a result of this and other related state litigation, federal courts have stayed all proceedings in civil rights actions challenging North Carolina's method of execution pursuant to § 1983. *See, e.g.*, *Stroud v. Beck*, No. 5:06-CT-3129-FL, (E.D.N.C. March 7, 2007) (order staying case pending further order of that court) (Exhibit C); *Conner v. Beck*, No. 5:06-CT-3032-D (E.D.N.C. Jan. 31, 2007) (order holding case in abeyance pending resolution of state court preliminary injunction) (Exhibit D). Therefore, in bringing the present action, Plaintiffs acknowledge that the questions raised herein cannot be resolved until a method of execution by lethal injection has been approved finally by the North Carolina state courts.

## II.     Plaintiffs

3.      Plaintiffs are United States citizens, residents of the State of North Carolina, and prisoners sentenced to death.  They are currently being held in the custody of Defendants and under the supervision and control of the North Carolina Department of Correction ("NC DOC") at Central Prison, 1300 Western Boulevard, Raleigh, North Carolina 27606.  All Plaintiffs have completed their direct appeals and have filed petitions for writs of habeas corpus in federal court. Some Plaintiffs' habeas corpus petitions are currently pending before a federal district court or the United States Court of Appeals for the Fourth Circuit.  Other Plaintiffs have had their habeas corpus petitions denied by the Fourth Circuit, and have petitions for writs of certiorari pending before the United States Supreme Court.  Still others have had their petitions for writs of certiorari denied by the Supreme Court.  However, no Plaintiff presently has an execution date.

## III.     Defendants

4.      Defendant Theodis Beck is the Secretary for NC DOC.  Defendant Gerald Branker is the Warden of Central Prison in Raleigh, North Carolina, the facility at which Defendants plan to carry out Plaintiffs' executions.  These Defendants are citizens and residents of North Carolina.  Defendants Unknown Executioners are employed or contracted by NC DOC and will make preparations for and carry out Plaintiffs' executions.  Plaintiffs do not yet know the identities of Defendants Unknown Executioners and are informed that the identities of Defendants Unknown Executioners will not be revealed.  All Defendants are being sued in their individual and official capacities.

## IV.     Jurisdiction and Venue

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights violation), § 2201 (declaratory relief), and § 2202 (further relief).  This action

3

arises under 42 U.S.C. § 1983, and the First, Eighth, and Fourteenth Amendments to the United States Constitution.

6.      Venue in this Court is proper under 28 U.S.C. § 1391(b), in that Plaintiffs are currently incarcerated at Central Prison in Raleigh, North Carolina, which is located in this District.  All executions conducted by NC DOC occur at Central Prison, and the events giving rise to this Complaint have occurred and will occur in this District.

## V.      Facts

7.      Pursuant to N.C. Gen. Stat. § 15-188, executions in North Carolina may only be carried out within Central Prison's execution chamber:

> [W]hen any person, convict or felon shall be sentenced by any court of the State having competent jurisdiction to be so executed, the punishment shall only be inflicted within a permanent death chamber which the superintendent of the State penitentiary is hereby authorized and directed to provide within the walls of the North Carolina penitentiary at Raleigh, North Carolina.

8.      Pursuant to N.C. Gen. Stat. § 15-187, such executions may only be carried out by lethal injection:

> Any person convicted of a criminal offense and sentenced to death shall be executed only by the administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent.

9.      The same statute, N.C. Gen. Stat. § 15-187, also provides the Warden discretion in this matter:

> The warden of Central Prison may obtain and employ the drugs necessary to carry out the provisions of this Article, regardless of contrary provisions in Chapter 90 of the General Statutes.

10.     Recent events have created a de facto moratorium on executions by lethal injection in North Carolina.  On April 7, 2006, Judge Malcolm Howard of the United States

District Court for the Eastern District of North Carolina found that North Carolina could not constitutionally proceed with its method of execution by lethal injection unless "there are present and accessible to [the inmate] throughout the execution personnel with sufficient medical training to ensure that [the inmate] is in all respects unconscious *prior to* and *at the time of* the administration of any [lethal dose]." *Brown v. Beck*, No. 5:06-CT-3018-H, 2006 WL 3914717, at *8 (E.D.N.C. Apr. 7, 2006) (order conditionally denying preliminary injunction) (emphasis in original). Defendants in *Brown v. Beck* subsequently persuaded Judge Howard to permit Willie Brown's execution to proceed by representing to the court that their execution protocol would be updated to include, among other things, the requirement that a doctor monitor Brown's anesthetic depth ("the April Protocol"). *See Brown v. Beck*, No. 5:06-CT-3018-H, at 4 (E.D.N.C. Apr. 17, 2006) (final order denying preliminary injunction) (Exhibit E).[1]

11.     However, on January 18, 2007, the North Carolina Medicial Board ("Medical Board") took the position that doctor participation in executions by lethal injection is unethical and that any doctor who participates in such executions will be subject to disciplinary action ("Position Statement"). http://www.ncmedboard.org (follow "Amendments and Proposed Changes to the NCMB's Laws, Rules, and Position Statements" hyperlink; then follow "Capital Punishment" hyperlink).

12.     Wake County, North Carolina Senior Resident Superior Court Judge Donald W. Stephens recently held that the Medical Board does not have the authority to discipline doctors

---

[1] It was later revealed that the doctor present at Willie Brown's execution was never told of this requirement, and in fact did not monitor Brown's anesthetic depth during the execution process. Hearing Tr., 242-52, May 21, 2007 in *Conner v. Council of State*, No. 07-GOV-0238, 07-GOV-0264 (N.C. O.A.H.) (Exhibit F); *see also Conner*, 07-GOV-0238, 07-GOV-0264, at 6 (Aug. 9, 2007 N.C. O.A.H.) (decision concluding that the Governor and Council of State should reconsider their approval of a proposed protocol) (Exhibit G).

for participating in executions and permanently enjoined the Medical Board from disciplining doctors who violate the Position Statement. *North Carolina Department of Correction v. North Carolina Medical Board*, No. 07-CVS-3574 (N.C. Sup. Ct. Sept. 21, 2007) (Exhibit H). However, on October 31, 2007, the Medical Board filed an appeal from this ruling that is currently pending before the North Carolina Court of Appeals. (Exhibit B).

13.     In response to the conflict over whether doctors may participate in executions by lethal injection created by Judge Howard's order in *Brown v. Beck* and the Medical Board's Position Statement, on January 22, 2007, several death row inmates filed a lawsuit in the Superior Court of Wake County, North Carolina before Judge Stephens challenging the April Protocol's constitutionality.  Counsel for defendants in that lawsuit then informed Judge Stephens that they would comply with the Medical Board's Position Statement by deleting from the April Protocol the requirement that a doctor participate in executions by monitoring an inmate's anesthetic depth.  On January 25, 2007, Judge Stephens preliminarily enjoined defendants from executing plaintiffs by lethal injection, holding that NC DOC could not change the April Protocol without prior approval from the Governor and Council of State pursuant to N.C. Gen. Stat. § 15-188.  *Robinson v. Beck*, No. 07-CVS-001109, at 2 (N.C. Sup. Ct. Jan. 25, 2007) (Exhibit I).

14.     Following Judge Stephens' order in *Robinson v. Beck*, on February 2, 2007, a proposed lethal injection protocol ("Proposed Protocol") was filed with the Governor and Council of State, who subsequently approved that Proposed Protocol at a hearing on February 6, 2007.  Consolidated Petitions for a Contested Case Hearing were then filed before Senior Administrative Law Judge Fred G. Morrison Jr. challenging the Governor and Council of State's approval of the Proposed Protocol.  On August 9, 2007, Judge Morrison issued a decision

6

concluding that the Governor and Council of State should reconsider their approval of the Proposed Protocol. *Conner*, 07-GOV-0238, 07-GOV-0264, at 15 (Aug. 9, 2007 N.C. O.A.H.) (Exhibit G). On November 1, 2007, the Governor and Council of State issued a decision rejecting Judge Morrison's decision and declining to reconsider their approval of the Proposed Protocol. (Exhibit A). This decision by the Governor and Council of State will be appealed and subjected to *de novo* review in North Carolina Superior Court pursuant to N.C. Gen. Stat. § 150B-51(b) and (c).

15. The Proposed Protocol, which is subject to ongoing litigation in North Carolina state courts, provides for executions in the following manner:

> Chapter 15, Article 19, of the North Carolina General Statutes prescribes the manner and procedures through which the sentence of death shall be carried out through lethal injection by the State of North Carolina acting through the North Carolina Department of Correction and the Warden of Central Prison. Article 19 vests the Warden of Central Prison with direct responsibility for providing necessary drugs, appliances and qualified personnel to carry out the sentence of death in accordance with law and the Execution Protocol approved by the Governor and Council of State. The following Execution Protocol has therefore been developed by the Warden of Central Prison and approved by the Secretary of the North Carolina Department of Correction.

> I.    Lethal Injection

> Death by lethal injection is caused by the administration of a lethal quantity of an ultrashort-acting barbiturate, such as sodium pentothal, in combination with a chemical paralytic agent, such as pancuronium bromide, and potassium chloride into the veins of a condemned prisoner. The condemned prisoner's level or state of consciousness during the execution process is observed visually and monitored utilizing an appliance, such as a bispectral index (BIS) monitor, from which the electrical activity in the condemned prisoner's brain can be interpreted.

> The lethal injection protocol ordinarily involves the successive, simultaneous slow intravenous administration of the

three lethal chemicals and non-lethal saline solution into the body of a condemned prisoner through two IV lines by means of a series of five injections. The lethal injection protocol is composed of the following steps:

a) The first injection is an ultrashort-acting barbiturate, such as dose of not less than 3000 mg of sodium pentothal, which quickly renders the condemned prisoner unconscious.

b) The second injection is a dose of not less than 30 mL of a saline solution, which flushes the equipment used for the intravenous administration of the lethal chemicals and saline solution following the administration of the ultrashort-acting barbiturate.

c) The Warden of Central Prison pauses the administration of the lethal chemicals and saline solution to verify that the output value displayed on the monitoring appliance, such as a value reading on a BIS monitor below 60, confirms a reduced level of electrical activity in the condemned prisoner's brain sufficient to indicate a very high probability of unconsciousness.

d) If a very high probability of unconsciousness is confirmed, such as value reading on a BIS monitor below 60, the Warden resumes the injection of the remaining lethal chemicals and saline solution. However, if a very high probability of unconsciousness is not confirmed, such as a value reading on a BIS monitor of 60 or above, repeated identical injections of the ultrashort-acting barbiturate, such as doses of not less than 3000 mg of sodium pentothal, will be administered until a very high probability of unconsciousness is confirmed, such as a value reading on a BIS monitor below 60, and the injection of the remaining lethal chemicals and saline solution is resumed.

e) The third injection is a chemical paralytic agent, such as a dose of not less than 40 mg of pancuronium bromide, which paralyzes the muscles of the condemned prisoner.

8

f) The fourth injection is a dose of not less than 160 mEq of potassium chloride, which interrupts nerve impulses to the heart causing the condemned prisoner's heart to stop beating.

g) The fifth injection is a dose of not less than 30 mL of a saline solution, which flushes the equipment used for the intravenous administration of the lethal chemicals and saline solution and completes the lethal injection protocol.

II.     Appliances

The Warden will acquire, from reputable manufacturers or suppliers, all appliances, equipment and other supplies as are required to carry out the administration of lethal drugs as described above. Such appliances, equipment and supplies shall include, at a minimum, the syringes, intravenous tubes and related materials ordinarily used by medical personnel to administer intravenous fluids to human patients. The Warden will also acquire and maintain such monitors or other equipment as shall be necessary to review human vital signs and functions, including cardiac activity, electrical activity in the brain, and respiration. The Warden will also be responsible for acquiring such other appliances, equipment, supplies or materials as medical personnel shall recommend for the purpose of ensuring that the sentence of death is carried out without exposing the condemned prisoner to a substantial risk of serious harm, pain or suffering and in accordance with constitutional requirements.

III.    Personnel

The Warden shall ensure that the lethal injection procedure is administered by personnel who are qualified to set up and prepare the injections described above, administer the preinjections, insert the IV catheter, and to perform other tasks required for this procedure in accordance with the requirements of Article 19 and this Execution Protocol. Medical doctors, physician assistants, advanced degree nurses, registered nurses, and emergency medical technician-paramedics, who are licensed or certified by their respective licensing boards and organizations, shall be deemed qualified to participate in the execution procedure. As required by Article 19, a licensed medical doctor shall be present at each execution. The doctor shall monitor the essential body functions of the condemned inmate and shall notify the

9

Warden immediately upon his or her determination that the inmate shows signs of undue pain or suffering. The Warden will then stop the execution. The doctor shall also be responsible for certifying the death of the inmate at such time as he or she determines the procedure has been completed as required by N.C.G.S. §15-192.

It is the intent of this Execution Protocol to carry out the sentence of death as required by the North Carolina General Statutes in accordance with all constitutional requirements as determined by the courts of North Carolina and the United States.

16.     Therefore, the Proposed Protocol calls for Defendants to execute Plaintiffs using a three-drug cocktail consisting of sodium pentothal, pancuronium bromide, and potassium chloride. Defendants will use the first drug, potassium chloride, to attempt to induce in Plaintiffs an anesthetic depth adequate to ensure that they will not experience excruciating pain and suffering during their executions.[2] Once Defendants believe that they have induced in Plaintiffs an adequate anesthetic depth, under the Proposed Protocol, they will proceed with the administration of pancuronium bromide and potassium chloride.

17.     Pancuronium bromide paralyzes all voluntary muscles, and in doing so, masks physical signs that could be relied upon to evaluate anesthetic depth. Pancuronium bromide also paralyzes the diaphragm, causing asphyxiation. N.C. Gen. Stat. § 15-187 requires that Defendants include this or some other chemical paralytic agent in the Proposed Protocol even though a chemical paralytic agent is unnecessary to the execution process. Indeed, while pancuronium bromide could kill Plaintiffs, the subsequent injection of potassium chloride causes

---

[2] While the Proposed Protocol consistently refers to Plaintiffs' anesthesia using the term "unconsciousness," it should be noted that a person may be "unconscious" yet still able to experience pain, such as one who is sleeping. In contrast, when referring to the drug-induced state in which a person is unable to experience pain, the proper term is "anesthetic depth." Anesthetic depth is the degree to which the central nervous system is depressed by a general anesthetic agent. The assessment of anesthetic depth is a medical determination that can only be done properly by a person with specialized training such as a nurse anesthetist or an anesthesiologist.

death by cardiac arrest before death by pancuronium-induced asphyxiation can occur. Therefore, pancuronium bromide's only role in the Proposed Protocol is to make Plaintiffs' executions appear more humane to observers by paralyzing Plaintiffs' voluntary muscle movements.

18.     The other lethal drug, potassium chloride, induces cardiac arrest and causes an intense burning sensation in the veins that has been likened to the feeling of putting an electric wire in one's arteries:

> David Work, former executive director of the N.C. Board of Pharmacy . . . said he experienced an injection of potassium chloride five years ago after heart bypass surgery . . . [that] was so painful that . . . he screamed until the nurse pulled out the needle. "I liken it to putting an electric wire in your artery," he said. It can only be worse for an inmate who receives a dose hundreds of times larger than the one he did, Work reasoned.

Weigl, Andrea, *Easley Urged to Halt Executions*, The News & Observer, Dec. 21, 2006, *available at* http://www.newsobserver.com/102/story/523734.html.

19.     Therefore, if Plaintiffs are not at an adequate anesthetic depth when pancuronium bromide and potassium chloride are administered, they will experience excruciating pain and suffering due to asphyxiation, cardiac arrest, and an intense burning sensation in their veins. However, due to pancuronium bromide's paralytic effects, Plaintiffs will be physically unable to express to witnesses or medical personnel that they are suffering, and under the circumstances, even an anesthesiologist will be unable to detect their pain.

20.     Evidence indicates that Defendants, using previous lethal injection methods similar to the Proposed Protocol, have in fact administered pancuronium bromide and potassium chloride to inmates who were not at an adequate anesthetic depth, thus actually inflicting the type of excruciating pain and suffering just described. Witnesses to a number of lethal injections carried out by Defendants in North Carolina have reported that some inmates writhed and convulsed during their executions. These reports are inconsistent with the expected reaction of a

11

properly anesthetized person. Furthermore, toxicology reports obtained from the North Carolina Office of the Chief Medical Examiner for at least one recent execution suggest that the level of sodium pentothal in the inmate's circulation at the time of execution was significantly less than Defendants' predicted level, raising further concerns about improper or inadequate administration of anesthesia under the Proposed Protocol.

21.     Defendants have the power to adopt measures that would eliminate or reduce the foregoing risks because North Carolina law does not prescribe or limit the manner in which venous access is obtained, the specific drugs used in carrying out executions by lethal injection, the specific dosages, sequences, procedures, or manner of administering and maintaining anesthesia during execution by lethal injection, or the certification, training, or licensure required of those who participate in the anesthesia process. Further, N.C. Gen. Stat. §§ 15-187 and 15-188 do not "limit the categories of drugs or chemicals that [NC DOC] can administer in carrying out lethal injection executions to 'only' an ultrashort-acting barbiturate in combination with a chemical paralytic agent." *State v. Hunt*, 591 S.E. 2d 502, 503 (N.C. 2003). Each of these matters is within Defendants' discretion.

22.     Nevertheless, in fifteen separate respects, Defendants' Proposed Protocol risks that Plaintiffs will not be placed at an anesthetic depth adequate to ensure that they do not experience the excruciatingly painful effects of pancuronium bromide and potassium chloride. First, the Proposed Protocol allows the use of bispectral index data from a BIS monitor[3] as the sole method of determining whether Plaintiffs are at an adequate anesthetic depth. This manner of using the BIS monitor is unacceptable for several reasons. Most importantly, the

---

[3] The BIS monitor's bispectral index is a scale of electrical activity in the brain, where 100 means that the patient is awake and zero means that the patient does not have any electrical brain activity.

overwhelming weight of medical, scientific, and professional information, demonstrates that the BIS monitor is only effective when used in conjunction with, not as a substitute for, an overall assessment of anesthetic depth incorporating conventional monitoring machines, such as an electrocardiograph to monitor the heart's electrical activity, with clinical techniques of visual and tactile monitoring of Plaintiffs, such as checking for purposeful or reflex movement. The Proposed Protocol's sole reliance on the BIS monitor to assess anesthetic depth is also problematic in view of medical evidence demonstrating that the administration of pancuronium bromide and potassium chloride can cause a BIS monitor to display an inaccurate value, and that bispectral index values far below 60 have been observed in fully awake individuals who have been administered pancuronium bromide. Furthermore, Scott Kelley, M.D., the vice president and medical director of BIS monitor manufacturer Aspect Medical Systems, stated that he would have prevented the sale of the BIS monitor to NC DOC had he known NC DOC's purpose in purchasing the monitor. (Exhibit J, ¶ 22). Instead, in the requisition form NC DOC sent to Aspect Medical Systems on April 11, 2006, NC DOC falsely stated that the BIS monitor would be "used to monitor vital signs and sedation scales of patients recovering from surgery." (Exhibit K). Finally, North Carolina is the only state which uses the BIS monitor to assess inmates' anesthetic depth during executions by lethal injection. Indeed, Dr. Kelley has noted that "BIS monitors have never been tested or submitted for approval or approved by the FDA for the use intended by [Defendants]." (Exhibit J, ¶ 12).

23. Second, even if the Proposed Protocol required the BIS monitor to be used in the proper manner, as one factor in an overall assessment, the execution chamber's physical layout makes it impossible for medical personnel to carry out the visual and tactile monitoring of Plaintiffs that is required for a proper overall assessment of anesthetic depth. Such monitoring is

not possible because medical personnel responsible for interpreting bispectral index data are positioned in an observation room that is adjacent to but physically separated from the execution chamber. Thus, those personnel cannot integrate bispectral index data with tactile monitoring of Plaintiffs. Furthermore, although medical personnel who are located within the observation room can view Plaintiffs in the execution chamber through a window, that view is impeded by the angling of Plaintiffs' bodies away from the observation room window, as well as a sheet that covers Plaintiffs' bodies. Moreover, personnel who are located within the execution chamber cannot visually and tactilely monitor Plaintiffs due to a curtain that separates those personnel from the inmate being executed. The foregoing physical impediments are particularly problematic in view of the Proposed Protocol's use of pancuronium bromide, whose paralytic effects will prevent Plaintiffs from moving, speaking, or breathing, thus making it impossible for medical personnel to assess anesthetic depth without visual and tactile monitoring of clinical signs such as pupil size and skin moisture. Presumably, the purpose of stationing medical personnel where they cannot visually or tactilely monitor Plaintiffs is to shield the identities of such personnel from execution witnesses. However, by wearing masks for example, the identities of medical personnel could be kept secret without impeding their ability to provide visual and tactile monitoring of Plaintiffs during their executions.

24.    Third, the execution chamber's physical layout also impedes the ability of medical personnel to observe a malfunction in the BIS monitor. Indeed, a person who is very apprehensive, such one awaiting imminent execution, may have sweat on their brow or activity of the muscles of the forehead. However, forehead moisture and forehead muscle activity are both recognized sources of interference that can prevent the BIS monitor's electrodes, which attach to the forehead, from providing an accurate readout. Even though this problem could

occur at any time during Plaintiffs' executions, Defendants' execution chamber prevents medical personnel from observing its occurrence by physically and visually separating them from Plaintiffs. Moreover, the Proposed Protocol does not have any plan in place for addressing this problem if it did occur during the execution process.

25.    Fourth, the Proposed Protocol does not incorporate any of the guidelines for proper use of the BIS monitor that are set forth in the BIS monitor manual. For example, the BIS monitor manufacturer warns in its manual that a bispectral index reading should be interpreted with caution in patients with neurological disorders or those taking psychoactive medications. However, the Proposed Protocol does not provide guidelines for identifying whether Plaintiffs meet these criteria, or for alternative means of monitoring Plaintiffs' anesthetic depth if it cannot be reliably evaluated using a BIS monitor.

26.    Fifth, the Proposed Protocol allows the Warden to determine anesthetic depth after injection of sodium pentothal solely upon a bispectral index reading of 60 or below on the BIS monitor. However, the Warden has no medical training and is not qualified to interpret bispectral index data, nor does the Proposed Protocol require the Warden to involve or consult any medical personnel before determining anesthetic depth using the BIS monitor.

27.    In addition to the Proposed Protocol's improper use of the BIS monitor, the Proposed Protocol also fails to provide proper guidelines in numerous other areas vital to ensuring that Plaintiffs are at an anesthetic depth during their executions adequate to prevent excruciating pain and suffering. In this regard, the sixth way in which the Proposed Protocol does not ensure an adequate anesthetic depth is its failure to provide a sufficient amount of physical space for the proper preparation, administration, and monitoring of the three-drug cocktail. Such crowded conditions are particularly problematic in light of the need for medical

personnel to simultaneously integrate multiple indicators of anesthetic depth, and the technical skill required to mix the anesthetic drug sodium pentothal into an aqueous solution prior to its use in Plaintiffs' executions.

28.     Seventh, the Proposed Protocol does not contain guidelines for obtaining and maintaining venous access.  For example, the Proposed Protocol contains no instructions indicating how to (A) determine whether peripheral or central venous access is appropriate;[4] (B) determine whether a venous cut down procedure is appropriate;[5] (C) obtain venous access using the appropriate method; (D) correctly insert the intravenous line to ensure that the drugs will enter the vein instead of the tissue surrounding the vein; or (E) inject the drugs into the intravenous line with the proper amount of pressure.  Excessive injection pressure can cause the vein to tear, rupture, or leak, thus causing the drugs to enter the tissue surrounding the vein instead of the vein itself.  If sodium pentothal enters the tissue surrounding the vein instead of the vein itself, the drug would not enter Plaintiffs' blood circulation and thus would fail to put Plaintiffs at an adequate anesthetic depth.

29.     Eighth, the execution chamber's physical layout, as set forth above, impedes the ability of medical personnel to visually and tactilely monitor the sites of Plaintiffs' intravenous lines.  These impediments risk that medical personnel will not detect errors in intravenous injection such as (A) leaks in the intravenous tube; (B) movement of the catheter out of the vein

---

[4] Venous access is peripheral when it is done through veins that are located away from the central part of the body, such as in the hands or arms.  However, in some patients, peripheral veins may be difficult to access due to obesity, vascular collapse, or frequent vein puncture.  In these cases, venous access may be obtained through a central line, in which the tip of the catheter is located in or near the chest cavity.

[5] In a cut down procedure, the vein is surgically exposed.  This method of venous access is sometimes used when peripheral or central intravenous lines are difficult to establish percutaneously, i.e. via needle puncture of the skin.

and into the surrounding tissue; (C) perforation, rupture, or leakage of the vein; or (D) impaired intravenous drug delivery due to restraining straps on Plaintiffs' arms. The fact that the execution chamber's physical layout prevents medical personnel from detecting such errors in anesthetic administration prior to the administration of pancuronium bromide or potassium chloride increases the risk that Plaintiffs will experience excruciating pain and suffering during their executions.

30. Ninth, the Proposed Protocol does not provide guidelines for monitoring Plaintiffs' anesthetic depth after administration of pancuronium bromide, or any other guidelines for the continued review and interpretation of BIS monitor data after administration of pancuronium bromide to ensure that Plaintiffs remain at an adequate anesthetic depth.

31. Tenth, neither the Proposed Protocol, nor any previous methods of execution by lethal injection in North Carolina, have provided guidelines for documenting how much of the sodium pentothal prepared for execution was actually injected into the inmate or how the injection of a particular amount of sodium pentothal affected the inmate's vital signs. This failure to require record-keeping risks that Defendants will repeat ineffective methods of anesthesia on Plaintiffs.

32. Eleventh, the Proposed Protocol does not authorize medical professionals qualified in the practice of anesthesia to intervene in the event that an appropriate plane of anesthesia is not achieved or maintained during the course of Plaintiffs' executions. The use of the BIS monitor does not remedy this deficiency because the Proposed Protocol does not include any plans for assessing anesthetic depth in the event that the BIS monitor fails to provide an accurate reading.

33.     Twelfth, the Proposed Protocol does not provide any guidelines which medical personnel can rely upon in exercising their discretion in the event of reasonably foreseeable complications.  For example, the Proposed Protocol includes no instructions indicating how to (A) identify or remedy errors in intravenous drug administration; (B) react to problems during drug administration; (C) compensate for equipment malfunctions; or (D) ensure that Plaintiffs' remain at an adequate anesthetic depth throughout their executions in the event that the Warden stops any of their executions because Plaintiffs are experiencing "undue pain and suffering."

34.     Furthermore, even if Defendants revised the Proposed Protocol to address all of the foregoing deficiencies, the Proposed Protocol would still pose a risk that Plaintiffs would be at an inadequate anesthetic depth when pancuronium bromide and potassium chloride are administered.  This is so because the Proposed Protocol does not ensure that execution personnel are qualified to properly carry out its guidelines.  Accordingly, the thirteenth way in which the Proposed Protocol risks executing Plaintiffs even though they are not at an adequate anesthetic depth is that it permits the Warden, who has no medical training, to select the drugs and monitoring equipment used to carry out Plaintiffs' executions by lethal injection without involving or consulting medical personnel.  The Proposed Protocol also permits the Warden to select different drugs and monitoring equipment at any time without oversight from any court or elected official.   Indeed, the Proposed Protocol only lists sodium pentothal, pancuronium bromide, potassium chloride, and the BIS monitor as examples of the components that must be used in executing Plaintiffs, and N.C. Gen. Stat. § 15-187 vests the Warden with the discretion to "obtain and employ the drugs necessary to carry out" executions.

35.     Fourteenth, the Proposed Protocol permits the Warden, who has no medical training, to select execution personnel without consultation with anyone qualified in the field of

anesthesiology. Moreover, the Proposed Protocol does not provide sufficient descriptions of the qualifications or training required of personnel responsible for the preparation, administration, and monitoring of anesthetic drugs, notwithstanding the fact that this task is a complex medical procedure requiring expertise in anesthesiology to be performed correctly. Nor does the Proposed Protocol contain sufficient descriptions of the qualifications or training required of personnel involved in obtaining venous access. The absence of personnel trained in venous access methods greatly increases the risk that Plaintiffs will not receive the amount of anesthetic necessary to reach an adequate anesthetic depth. This is especially true in the event that a venous cut down procedure is necessary, as this requires surgical expertise.

36. Fifteenth and finally, although the Proposed Protocol requires a doctor to monitor Plaintiffs' "essential body functions," it neither provides a description of that doctor's qualifications, nor does it specify whether that doctor must have any training or prior clinical experience with the BIS monitor or with anesthesiology.

37. In view of the foregoing, the Proposed Protocol risks that Plaintiffs will not be at an adequate anesthetic depth when pancuronium bromide and potassium chloride are administered, and thus will experience excruciating pain and suffering.

38. In addition to the risk of executing Plaintiffs even though they are not at an adequate anesthetic depth, Defendants' proposed method of execution poses three additional risks. First, the Proposed Protocol risks inflicting brain damage on Plaintiffs because it permits the Warden to stop the execution if Plaintiffs are experiencing "undue pain or suffering," but does not specify how the execution will be stopped or what medical supplies will be used to do so. However, stopping an execution without proper medical supplies, such as a crash cart, will

likely cause brain damage and thus only serve to inflict additional pain and suffering on Plaintiffs.

39.     Second, the Proposed Protocol does not provide any guidelines for keeping Plaintiffs alive in the event that a stay of execution is granted after pancuronium bromide or potassium chloride is administered.  This omission risks executing Plaintiffs even if a court or the Governor has spared them from the death penalty.

40.     Finally, despite the fact that they have the discretion to do so, Defendants have failed to adopt readily available remedial measures that would eliminate or reduce the risks of inflicting excruciating pain and suffering posed by the Proposed Protocol.  For example, Defendants have failed to research and implement appropriate (A) standards of practice for obtaining venous access; (B) standards of practice for maintaining Plaintiffs' anesthetic depth throughout their executions by lethal injection; (C) guidelines to ensure that personnel who administer the anesthetic and lethal injection are properly trained and qualified; (D) guidelines to ensure that executions may be stopped without causing brain damage to Plaintiffs; (E) facilities or procedures that allow visual and tactile monitoring of Plaintiffs during the execution process; or (F) alternative drugs that would eliminate or reduce the risk of administering excruciatingly painful drugs to Plaintiffs while they are at an inadequate anesthetic depth, or any other risk of inflicting excruciating pain and suffering that the Proposed Protocol may present.

41.     The risks set forth above, i.e. of inflicting excruciating pain and suffering on Plaintiffs by failing to place them at an adequate anesthetic depth during their executions, of causing Plaintiffs brain damage, of executing Plaintiffs even after a court or the Governor has spared them from the death penalty, and of implementing a Proposed Protocol that has known risks of inflicting excruciating pain and suffering even though remedial measures are readily

available, are substantial and unnecessary. Defendants are aware of these risks and have chosen to recklessly disregard them.

## VI. First Claim for Relief

**THE PROPOSED PROTOCOL VIOLATES PLAINTIFFS' RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### 42 U.S.C. § 1983

42.     Plaintiffs incorporate each of the foregoing paragraphs by reference.

43.     Defendants are acting under color of North Carolina law in undertaking to execute Plaintiffs by lethal injection pursuant to the Proposed Protocol.

44.     The Proposed Protocol risks inflicting excruciating pain and suffering by failing to ensure that Plaintiffs are at an adequate anesthetic depth during their executions.

45.     The Proposed Protocol risks inflicting brain damage on Plaintiffs because it permits the Warden to stop the execution if Plaintiffs are experiencing "undue pain and suffering," but does not specify how the execution will be stopped or require the presence of proper medical supplies, such as a crash cart.

46.     The Proposed Protocol risks executing Plaintiffs even if they have been granted a stay of execution because it contains no guidelines for keeping them alive in the event that such a stay is granted after pancuronium bromide or potassium chloride is administered.

47.     Defendants intend to execute Plaintiffs using a Proposed Protocol that has known risks of inflicting excruciating pain and suffering even though remedial measures that would eliminate or reduce these risks are readily available.

48.     For these reasons, the Proposed Protocol violates Plaintiffs' right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

## VII.     Second Claim for Relief

**N.C. GEN. STAT § 15-187, N.C. GEN. STAT. § 15-188 AS APPLIED BY DEFENDANTS, AND THE PROPOSED PROTOCOL VIOLATE PLAINTIFFS' RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### 42 U.S.C. § 1983

49.     Plaintiffs incorporate each of the foregoing paragraphs by reference.

50.     Defendants are acting under color of North Carolina law in undertaking to execute Plaintiffs by lethal injection pursuant to N.C. Gen. Stat. § 15-187, N.C. Gen. Stat. § 15-187 as applied by Defendants, and the Proposed Protocol.

51.     Due to N.C. Gen. Stat. § 15-187 and the Proposed Protocol's requirement that pancuronium bromide or some other chemical paralytic agent be used in Plaintiffs' executions, medical personnel will not be able to properly assess anesthetic depth without visual and tactile monitoring of Plaintiffs.  However, N.C. Gen. Stat. § 15-188 requires that Plaintiffs' executions occur within Central Prison's execution chamber, which Defendants have established in a manner that impedes visual and tactile monitoring of Plaintiffs.  Therefore, taken together, N.C. Gen. Stat. § 15-187, N.C. Gen. Stat. § 15-188 as applied by Defendants, and the Proposed Protocol risk that Plaintiffs will be physically unable to express to witnesses or medical personnel that they are suffering, and under the circumstances, even an anesthesiologist will be unable to detect their pain.  These laws run this risk even though a chemical paralytic agent is unnecessary to the execution process and the identities of execution personnel could be kept secret without impeding their ability to visually and tactilely monitor Plaintiffs.

52.     For this reason, N.C. Gen. Stat. § 15-187, N.C. Gen. Stat. § 15-188 as applied by Defendants, and the Proposed Protocol violate Plaintiffs' right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

## VIII.   Third Claim for Relief

**N.C. GEN. STAT. § 15-187, N.C. GEN. STAT. § 15-188 AS APPLIED BY DEFENDANTS, AND THE PROPOSED PROTOCOL VIOLATE PLAINTIFFS' RIGHT TO EQUAL PROTECTION OF THE LAWS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

### 42 U.S.C. § 1983

53.     Plaintiffs incorporate each of the foregoing paragraphs by reference.

54.     Plaintiffs are similarly situated to others who undergo anesthesia because both are subject to the same complex medical procedures involved in placing a person at an anesthetic depth adequate to proceed with otherwise excruciatingly painful procedures.  However, N.C. Gen. Stat. § 15-187, N.C. Gen. Stat. § 15-188 as applied by Defendants, and the Proposed Protocol treat Plaintiffs differently from others who undergo anesthesia.

55.     In particular, unlike others who undergo anesthesia, Plaintiffs are subject to N.C. Gen. Stat. § 15-187 and the Proposed Protocol's additional requirement that pancuronium bromide, or some other chemical paralytic agent, be used in carrying out their executions by lethal injection.  Plaintiffs are also subject to N.C. Gen. Stat. § 15-188's additional requirement that their anesthesia may only be administered in Central Prison's execution chamber.  As applied by Defendants, N.C. Gen. Stat. § 15-188 has resulted in an execution chamber whose physical layout impedes visual and tactile monitoring of Plaintiffs during the execution process.  However, due to pancuronium bromide's paralytic effect, without proper visual and tactile monitoring of Plaintiffs, it would be impossible for medical personnel to ensure that Plaintiffs

are at an adequate anesthetic depth during the administration of pancuronium bromide and potassium chloride.

56.     There is no rational basis for imposing this additional risk of excruciating pain and suffering on Plaintiffs.

57.     For this reason, N.C. Gen. Stat. § 15-187, N.C. Gen. Stat. § 15-188 as applied by Defendants, and the Proposed Protocol violate Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

### IX.     Fourth Claim for Relief

**N.C. GEN. STAT. § 15-187 AND THE PROPOSED PROTOCOL VIOLATE PLAINTIFFS' RIGHT TO FREEDOM OF SPEECH UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**42 U.S.C. § 1983**

58.     Plaintiffs incorporate each of the following paragraphs by reference.

59.     N.C. Gen. Stat. § 15-187 and the Proposed Protocol require the use of pancuronium bromide or some other chemical paralytic agent in carrying out Plaintiffs' executions by lethal injection.

60.     However, under the Proposed Protocol, where Plaintiffs' death will be caused by potassium chloride induced cardiac arrest, the use of any chemical paralytic agent, including pancuronium bromide, is unnecessary to the process of executing Plaintiffs by lethal injection. Rather, this drug's only role is to make Plaintiffs' executions appear more humane to observers by paralyzing their voluntary muscle movements, thereby rendering Plaintiffs unable to express to witnesses from the public and media whether they are experiencing any pain and suffering.

61.     For these reasons, N.C. Gen. Stat. § 15-187 and the Proposed Protocol violate Plaintiffs' right to freedom of speech under the First and Fourteenth Amendments to the United States Constitution.

## X.      Prayer for Relief

THEREFORE, Plaintiffs respectfully request that:

62.     This Court enter a declaratory judgment to the effect that N.C. Gen. Stat. § 15-187, N.C. Gen. Stat. § 15-188 as applied by Defendants, and the Proposed Protocol violate the United States Constitution in the manner set forth above;

63.     This Court grant preliminary and permanent injunctions to prevent Defendants from executing Plaintiffs pursuant to N.C. Gen. Stat. § 15-187, N.C. Gen. Stat. § 15-188 as applied by Defendants, and the Proposed Protocol;

64.     This Court grant reasonable attorney's fees pursuant to 42 U.S.C. § 1998 and the laws of the United States, as well as costs of suit; and

65.     This Court grant any further relief as it deems just and proper.

Respectfully submitted, this the 21st day of November, 2007.


/s/ Thomas K. Maher
THOMAS K. MAHER
N.C. State Bar # 12771
Tom@cdpl.org
Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, NC 27601
Phone: (919) 956-9545
Fax:     (919) 956-9547


/s/ Kenneth J. Rose
KENNETH J. ROSE
N.C. State Bar # 17208
Ken@cdpl.org

Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, NC 27701
Phone: (919) 956-9545
Fax:    (919) 956-9547


/s/ David Weiss_____
DAVID WEISS
N.C. State Bar # 35647
David@cdpl.org
Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, NC 27701
Phone: (919) 956-9545
Fax:    (919) 956-9547

Attorneys for Plaintiffs